THE MILLIKIN NATIONAL BANK OF DECATUR, Plaintiff-Appellant, v. PETER SCHWABE CORPORATION, Defendant and Third–Party Plaintiff-Appellee (Danny Binge *et al.*, Third-Party Defendants.)

Fourth District   No. 4—87—0732

Opinion filed December 7, 1988.

Jeff Justice, of Hull, Campbell & Robinson, of Decatur, for appellant.

Mitchell K. Shick, of Harlan Heller, Ltd., of Mattoon, for appellee.

JUSTICE KNECHT delivered the opinion of the court:
Plaintiff Millikin National Bank of Decatur brings this appeal following the September 17, 1987, ruling of the circuit court of Macon County, granting summary judgment in favor of defendant Peter Schwabe Corporation. We are asked to decide whether acknowledgment of an assignment by defendant's employee was sufficient notice to defendant under section 1—201(27) of the Uniform Commercial Code (Code) (Ill. Rev. Stat. 1985, ch. 26, par. 1—201(27)). As certain issues of fact are raised by this record, we reverse.

The events leading up to this lawsuit involved three parties: the plaintiff bank, defendant general contractor, and the subcontractor, Binge and Sodowsky Construction Company, Inc. (Binge and Sodowsky). Defendant's third-party indemnification action against Binge and Sodowsky's owners is not involved in this appeal.

The two-count complaint filed September 4, 1986, alleged that on December 11, 1985, plaintiff made two loans to Binge and Sodowsky in the sums of $14,000 and $5,700. As security for the loans, plaintiff requested Binge and Sodowsky to assign to plaintiff the proceeds of two subcontracts entered into between defendant and Binge and Sodowsky. Under the subcontracts, dated October 16, 1985, and November 18, 1985, Binge and Sodowsky was to furnish carpentry work for two McDonald's restaurants in Tuscola and Champaign, Illinois. Binge and Sodowsky assigned the proceeds of these subcontracts to plaintiff.

The complaint alleged Michael Sodowsky, president of Binge and

Sodowsky, met with Pat Colby, defendant's construction superintendent at the Tuscola jobsite, who had "apparent authority" to accept assignments for defendant. Colby signed two acknowledgments, one for each subcontract. In count I, plaintiff alleged defendant received notice of the assignment through notice given to Colby. Count II alleged plaintiff requested the assignment be acknowledged by defendant. Both counts alleged defendant failed to pay the subcontract proceeds to plaintiff.

The two assignment forms used are identical and appear in the record. All the headings referred to are centered, underscored, and appear in capital letters. At the top of the page is the word "Assignment." The form identifies the date of the contract whose proceeds are to be assigned and states all disbursements should be made payable to the plaintiff and Binge and Sodowsky. The assignment is signed by Michael Sodowsky as president of Binge and Sodowsky. Immediately underneath Sodowsky's signature appears a heading which reads "Acceptance of Assignment." This section contains an acceptance of the assignment signed by James P. Walker as assistant vice-president of plaintiff. Underneath Walker's signature appears "Acknowledgment of Assignment." Below it appears the following: "Peter Schwabe Corp., hereby acknowledges receipt of a copy of the above and foregoing Assignment." Pat Colby's signature appears on the signature line. All three signatures are dated December 9, 1985.

Defendant's answer, filed February 3, 1987, essentially admitted Binge and Sodowsky assigned the proceeds of the contracts, that Sodowsky met with Colby, and that the amounts to be paid under the contracts were paid directly to Binge and Sodowsky. Defendant denied either it or Colby accepted the assignment or that Colby had apparent authority to accept the assignment. Defendant's answer to count I further denied defendant had notice of the acceptance. The answer to count II also denied plaintiff directly asked defendant to acknowledge the assignments.

Defendant's June 26, 1987, motion for summary judgment claimed the record showed defendant did not receive notice of the assignments and was entitled to judgment as a matter of law. Attached to the motion were excerpts from the depositions of Pat Colby, Peter Odinsoff, Jr., and Michael Sodowsky. Apparently, the full depositions of Colby, Odinsoff, and Sodowsky were also submitted to the court. Although the briefs refer to deposition testimony by James P. Walker, assistant vice-president of plaintiff, Walker's deposition is not included in the record on appeal.

Colby's deposition testimony indicated he worked as job superin-

tendent with defendant, which operated a business office in Valparaiso, Indiana. Sodowsky approached Colby at the Tuscola jobsite, stated he was taking out a loan, and said he needed confirmation he had a contract with defendant. Colby stated he asked Sodowsky if he could sign as a superintendent. He later testified he asked Sodowsky if his signature would "work." Sodowsky replied he just needed confirmation he had the contracts. Colby stated he did not read the sheets of paper Sodowsky handed him to sign because Sodowsky had always been trustworthy. Sodowsky did not prevent Colby from reading the documents and did not conceal the contents. Colby "chose to believe" Sodowsky and signed the documents, one for the Tuscola contract, and one for the Champaign contract. Colby stated he knew Sodowsky had the subcontracts for the carpentry work at both sites. Sodowsky left copies with Colby, but Colby did not know where they were or what happened to them. He stated he did not think it was that important. He subsequently said he did not remember if he was given copies or what he did with them. He did not know if Sodowsky or the bank were ever paid.

Colby stated his job required him to lay out work for subcontractors. He was not authorized to make changes from the subcontract without a work order from the office. He was not authorized to disburse funds or discharge a subcontractor for nonperformance. When asked "Have you signed documents for other subcontractors acknowledging that they did have a contract with your company?" Colby replied "Only if it is released from the office." Although during his deposition he stated he signed documents if subcontractors needed them for credit references, he later said he gave credit references for "ourselves," not subcontractors.

Peter Odinsoff, Jr., defendant's vice-president of operations, testified his duties involved the day-to-day running of the company. He stated a subcontractor had never requested acceptance of an assignment or had his "draw" assigned to someone else. He stated neither he nor anyone else in his company had ever seen the assignment documents prior to the lawsuit.

Odinsoff described the corporate structure of defendant as including a vice-president, a project manager, and four construction superintendents, of whom Colby was one. He described the construction superintendent's job as to generally oversee construction and make sure everything is done according to plan specifications. The superintendent makes sure subcontractors have enough people on the job to keep the job going. While the construction superintendent may have authority to purchase certain materials, he cannot authorize work

changes. Any work beyond the contract terms is ordered by the vice-president or the project manager. Odinsoff indicated a construction superintendent has some discretion to purchase materials over the contract limits, as long as those amounts are relatively small. The construction superintendent is held out as having authority to pay for materials purchased on credit.

Odinsoff did not know if the general custom in the construction industry allowed a construction superintendent to accept an assignment on behalf of the general contractor. Colby did not have authority to sign a work order that increased the amount payable to the contractor.

Michael Sodowsky, president of Binge and Sodowsky, indicated he had borrowed money many times, and in several instances he had to assign the proceeds of his contracts to the bank in order to obtain the loans. He normally would see "whoever I was dealing with on that job," and obtain the assignment before he started the work. Sometimes he would go to the jobsite and have the representative there, the general foreman or area superintendent, sign the acknowledgment. He stated he borrowed 10 to 15 times from 1983 until the time Binge and Sodowsky stopped doing business. He estimated the bank requested an assignment on 70% of those loans. In this case, plaintiff asked him to sign an assignment and obtain the signature of a representative from the contractor.

In keeping with Sodowsky's usual procedure of obtaining acceptance of the assignment before the job had begun, Sodowsky stated he had discussed the assignment in question with someone at defendant's office. He stated "I talked to somebody higher than him [Colby] first. I can't remember who it was, and then they said, well just clear it with Pat, he would sign it or whatever." He said he made several phone calls to defendant's office to discuss each assignment.

Sodowsky stated he did not remember whether he met with Colby in Decatur or Champaign. He said he told Colby the documents were assignments, he had borrowed money to do this job, and he could not do the job unless he had the money. To obtain the money he had to have the assignments signed. Colby stated "Yes, he [Colby] had already talked to his people about it and then said no problem. He said give it here and that's what took place." No subsequent discussion occurred about what the payment procedure would be. Sodowsky stated he used the word "assignment" in talking with Colby. Sodowsky thought Colby was familiar with the term because it was used in subsequent conversations about the financial circumstances of other subcontractors. Sodowsky testified Colby did not indicate he did not

know what he was signing.

Sodowsky could not remember the name of the person "higher up" at defendant's company to whom he talked or when the conversation occurred. He stated he would always take the document out to the area representative, who would sign it. He said he always called the company beforehand to let them know what he was doing before he started the job. He indicated that the procedure was always the same. He remembered he had done this on five other occasions with other contractors, but could recall the name of only one other than defendant.

Sodowsky understood the purpose of the assignment was to make sure plaintiff's name was on the check. His customary procedure was to tell the contractor to put both the bank and the subcontractor's names on the check. He did not instruct Colby in this manner because he thought Colby knew what the assignment was for. He acknowledged the full amounts of the notes were not paid to plaintiff.

Defendant also submitted the affidavit of Valerie Heaton, who worked in the bookkeeping and payroll departments at defendant's home office in Big Bend, Wisconsin. She described the disbursement procedure and stated that once an assignment had been received, checks would have been made payable to the plaintiff and Binge and Sodowsky. She stated her office was notified of plaintiff's claim in September or October of 1986. An attached list of payees for 1985 showed that any checks made out to Binge and Sodowsky were made payable solely to that company. Another list, dated November 17, 1986, showed plaintiff included in the list of payees as of that date. There is no evidence showing whether defendant issued any checks to plaintiff and Binge and Sodowsky after that date. Along with a memorandum in opposition to the motion for summary judgment, plaintiff submitted an affidavit in which Walker stated he received a copy of a form 1099 miscellaneous income report from the Internal Revenue Service on January 21, 1987. The attached form listed plaintiff and Binge and Sodowsky as the recipient. It showed defendant paid the recipient $16,537 during 1986.

The court found no genuine issue of material fact, and granted defendant's motion for summary judgment by docket entry dated September 17, 1987. This appeal followed.

Plaintiff argues the acceptance of assignment by Colby was effective and should be imputed to defendant. Defendant argues Colby was an inappropriate person to receive notice under section 1—201(27) of the Code, and therefore had no duty to communicate the information to his superiors.

■■■ Summary judgment should be granted only when the pleadings, depositions, and admissions, together with any affidavits, show there is no genuine issue as to a material fact and that the movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c); see *Fooden v. Board of Governors* (1971), 48 Ill. 2d 580, 272 N.E.2d 497, *cert. denied* (1972), 408 U.S. 943, 33 L. Ed. 2d 766, 92 S. Ct. 2847.) The court has a duty to construe evidence strongly against movant and liberally in favor of opponent. (*Stringer v. Zacheis* (1982), 105 Ill. App. 3d 521, 522, 434 N.E.2d 50, 52.) We conclude sufficient questions are raised by the deposition testimony to warrant reversal.

Our analysis begins with section 9—318(3) of the Code, which states:

"The account debtor is authorized to pay the assignor until the account debtor receives notification that the amount due or to become due has been assigned and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the account debtor, the assignee must seasonably furnish reasonable proof that the assignment has been made and unless he does so the account debtor may pay the assignor." Ill. Rev. Stat. 1985, ch. 26, par. 9—318(3).

In this case, defendant is the account debtor, Binge and Sodowsky is the assignor, and plaintiff, the assignee. Under section 9—318(3), defendant was authorized to pay Binge and Sodowsky until it received notification the amounts due under the subcontracts were to be paid to plaintiff. The parties agree the assignment properly demanded that payment be made to the assignee.

Whether notice to Colby was sufficient to constitute notice to defendant is governed by section 1—201(27), which states:

"Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the

transaction and that the transaction would be materially affected by the information." Ill. Rev. Stat. 1985, ch. 26, par. 1—201(27).

The definition of due diligence was added to the Code in 1965. The Illinois Code Comment states the clarification of due diligence was designed to allay the fear that the original subsection (27)

" 'would require any large business organization to make an extensive investigation, before purchasing commercial paper or investment securities, as to whether it had notice of an adverse claim. As revised, the subsection removes any basis for the fear, but retains the same standard for financial institutions as for other organizations, and applies equally to protect an organization located in a single place and an organization operating through two or more branches.' " Ill. Ann. Stat., ch. 26, par. 1—201(27), Illinois Code Comment at 17-18 (Smith-Hurd Supp. 1987), quoting Report No. 1, Permanent Editorial Board, Uniform Commercial Code 17-18 (1962) (see 1 U.L.A. 50-51 (1976)).

Under section 1—201(27), notice is effective from the time it is brought to the attention of the person conducting the transaction. Who this person was is unclear from the record. Odinsoff signed the subcontracts on defendants' behalf, but Heaton's affidavit indicates defendant operated a home office in Wisconsin, whose bookkeeping and payroll departments were required to receive notice before the assignee would be paid. Thus, a question of fact exists as to who was conducting the transaction.

■ We note the Code does not define the term "transaction." The plaintiff claims the transaction here is the underlying subcontract, not the assignment itself. To construe the assignment to be both the transaction and the information affecting it would lead to an absurd result. Since this construction is to be avoided (*Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 489 N.E.2d 1374), we define "transaction" as the matter which the communication would materially affect.

Plaintiff asserts that since Colby received copies of the documents, defendant received notice. Colby testified Sodowsky gave him copies, but later stated he did not recall receiving copies. Sodowsky stated he left copies with Colby. This conflict creates an issue of fact to be resolved below.

In *Bank of Salt Lake v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints* (Utah 1975), 534 P.2d 887, the supreme court of Utah ruled notice of assignment was not received by a church when the acknowledgment was signed by a clerk at that

church. The church bought furniture and fixtures from a supplier. The supplier's bank subsequently requested an assignment which included accounts receivable from the church. The supplier directed the bank to address letters of assignment and an acknowledgment to the clerk and took the documents to the clerk for his signature. The clerk, whose duties were primarily clerical, stated he had no authority to sign. The purchase orders received from the church did not come from the clerk's department. The supplier made assurances he would take the acknowledgment to the proper church department. The clerk signed the acknowledgment. This procedure was repeated three additional times over the next year. The bank was never paid.

In holding the assignment ineffective, the court relied on the definitions of "notice" in section 1—201(25) and "knows or knowledge" in section 1—201(26) of the Utah version of the Code, whose definitions are essentially the same as those in the corresponding portion of the Illinois statute. It also concluded, under section 1—201(27) of the Utah version of the Code, due diligence did not require communication of the information as the clerk's duties did not include such communication. Since the clerk did not know the terms of the assigned invoices, he could not know the transaction would be materially affected by the information.

■■ An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. (Ill. Rev. Stat. 1985, ch. 26, par. 1—201(27).) The record here contains no evidence indicating whether defendant had reasonable routines for communicating significant information to the person conducting the transaction. Odinsoff testified he had never before dealt with an assignment. Given the geographical scope of defendant's 75-year-old construction business, it is not inconceivable defendant would employ procedures for communicating information from the field to persons overseeing the company's various operations. Whether there was reasonable compliance with any routines that may have been in effect is not addressed by the evidence.

■■ Due diligence would not require Colby to communicate information unless such communication is (1) part of his regular duties or (2) unless he has reason to know of the transaction and that the transaction would be materially affected by the information.

Colby's and Odinsoff's deposition testimony indicates Colby's primary duties were to lay out work for subcontractors and to make sure the work was completed according to specification. He had no authority to bind defendant financially other than in the purchase of

materials. The fact Colby asked Sodowsky if his signature would "work" suggests Colby was unsure of his authority to sign. However, whether Colby's duties included signing such documents depends upon the kind of document he signed, and whether he knew what he was signing.

Here, the evidence conflicts. Colby stated he had signed verifications of subcontracts before and that Sodowsky told him the documents were verifications. Sodowsky stated Colby indicated he knew the forms were assignments when he signed them. Colby did not read the documents presented for his signature. The record does not indicate if the jobsite was a place which was held out by defendant as the place for receipt of such communications. If defendant relied upon its job superintendents in general to communicate with subcontractors, communicating the information regarding assignments might have been within Colby's regular duties. The record is unclear on this issue.

Even if signing such documents was not part of Colby's regular duties, we conclude an issue of fact exists relating to whether Colby knew of the transaction and that the transaction would be materially affected by the information. The record indicates Colby knew Binge and Sodowsky had the subcontracts for the Tuscola and Champaign restaurants. Sodowsky testified Colby indicated he knew what the assignment forms were when he signed them. He also indicated he had talked with someone at defendant's office and that person had discussed the matter with Colby. According to Sodowsky, Colby stated he had already talked to the people in the office about the assignment.

When Colby was asked if he had signed documents for subcontractors to acknowledge they had a contract with defendant, he stated, "Only if it is released from the office." Whether "the office" is defendant's or the subcontractors' is unclear. However, this reference to the need for official approval suggests Colby may have known what the assignment was and knew it had something to do with the contract between defendant and Binge and Sodowsky.

Since a genuine issue of material fact exists with regard to whether defendant exercised due diligence, we reverse the judgment of the circuit court of Macon County.

Reversed.

McCULLOUGH, P.J., and GREEN, J., concur.